# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 20-588V
UNPUBLISHED

| | |
|---|---|
| BYRON WILSON,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: October 5, 2021<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Guillain-Barré Syndrome<br>(GBS) |

*Matthew B. Vianello, Jacobson Press P.C., Clayton, MO,* for Petitioner.

*Tyler King, U.S. Department of Justice, Washington, DC,* for Respondent.

### DECISION AWARDING DAMAGES[1]

On May 12, 2020, Byron Wilson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine administered to him on October 2, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters – and although entitlement was conceded, the parties could not settle damages to be awarded.

For the reasons set forth below, and after hearing argument from the parties, I find that Petitioner is entitled to compensation in the amount of **$176,123.85**, representing

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**$175,000.00** for actual pain and suffering, plus **$1,123.85** for past unreimbursable expenses**.**

## I.     Relevant Procedural History

Approximately 9 months after this case was initiated, Respondent filed his Rule 4(c) Report on February 8, 2021, conceding that Petitioner was entitled to compensation. ECF No. 27. A Ruling on Entitlement was subsequently issued on February 22, 2021. ECF No. 28. The parties thereafter attempted to informally resolve damages but were unsuccessful. ECF No. 32. A status conference was held on May 18, 2021, and on that same date, I issued a scheduling order regarding the briefing of disputed damages issues. ECF No. 33. The parties filed their respective briefs (ECF Nos. 34 ("Br."), 35 ("Opp."), and 37 ("Resp.")). I thereafter proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed damages issues. ECF. No. 39. The hearing was held on September 24, 2021,[3] and the case is now ripe for a determination.

## II.    Relevant Medical History

A complete recitation of the facts can be found in the Petition, the medical records, the parties' respective pre-hearing briefs, and in Respondent's Rule 4(c) Report. In brief summary, on October 2, 2019, Mr. Wilson received a flu vaccine. Ex. 15 at 5. Prior to vaccination, Mr. Wilson had no significant medical history, and was able to walk three to four miles daily and go fishing. Ex. 4 at 67; Ex. 7 at 499, 506.

According to Mr. Wilson, nearly three weeks after vaccination (on October 18, 2019) he began experiencing numbness and tingling in his feet, which over the course of the next three days spread to his hands, arms, and legs. Ex. 3 at 1; Ex. 4 at 67; Ex. 5 at 34. After presenting to his primary care physician, Mr. Wilson's physician referred him to the emergency room (ER). After a series of tests, including laboratory tests, a lumbar puncture, a chest x-ray, and a head CT scan, Mr. Wilson was discharged from the ER on October 22, 2019, with diagnoses of weakness and numbness. *See* Ex. 6 *generally*.

Mr. Wilson's condition worsened, and on October 23, 2019, the day after he was discharged from the ER, he presented to a different hospital with "progressive weakness rapidly progressing over the course of 3 days now creating subjective difficulty with breathing . . ." which was "concerning for [GBS]." Ex. 5 at 238. Mr. Wilson was referred

---

[3] At the end of the hearing held on September 24, 2021, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

and admitted to the neuro intensive care unit (NICU). *Id*. On admission, he was diagnosed with Acute Motor Axonal Neuropathy (AMAN) variant of GBS and was started on plasma exchange therapy (PLEX). *Id*. at 110, 118. Mr. Wilson received five sessions of PLEX therapy during his inpatient hospitalization. *Id*. at 272.

Mr. Wilson's condition continued to worsen during his hospitalization, including absent reflexes, tetraparesis, and worsening respiratory issues. Ex. 5 at 248. Given his worsening respiratory status, Mr. Wilson was intubated on October 25, 2019. *Id*. at 110. On October 29, 2019, while Mr. Wilson was intubated, he abruptly experienced an episode of asystolic arrest. Ex. 5 at 232. Chest compressions were initiated for approximately sixty seconds and return of spontaneous circulation (ROSC) was obtained. *Id*. The cardiologist noted that the asystolic arrest was probably driven and related to AIDP (acute inflammatory demyelinating polyneuropathy), a form of GBS. *Id*. at 259.

Mr. Wilson's condition subsequently improved, he was extubated on November 1, 2019, and on November 6, 2019, he was discharged from the hospital and admitted to inpatient rehabilitation at a skilled nursing facility (SNF). Ex. 5 at 118, 341; Ex. 7 at 1. Mr. Wilson was admitted to the SNF for skilled physical therapy (PT), occupational therapy (OT), and speech therapy (ST). Ex. 7 at 184-186. On December 9, 2019, Mr. Wilson was discharged from the SNF to outpatient therapy. Ex. 7 at 2. At the time of his discharge, Mr. Wilson's condition further improved including "significant progress in functional mobility including ambulating, transferring with less assist, and initiating manual wheelchair training . . . ." Ex. 7 at 57. Mr. Wilson, however, was still non-ambulatory and during his SNF stay he developed a bed sore and shingles. *Id*. at 155, 690,1726; Ex. 3 at 2. Mr. Wilson attended outpatient physical therapy between December 2019, and May 2020, for a total of 62 sessions. *See* Exs. 8 and 13 *generally*. Mr. Wilson attended outpatient occupational therapy between December 2019, and March 2020, for a total of 32 sessions. *See* Ex. 9 *generally*.

By March 2020, Mr. Wilson was continuing to experience effusion, swelling, mild fatigue and some pain, but by August 2020, his strength was full. Ex. 4 at 86-97; Ex. 16 at 1. Mr. Wilson's complaint during that visit was hamstring and low back tightness as well as shoulder pain and popping noises. *Id*. He was noted to be able lift his arms overhead without difficulty, albeit with mild left shoulder pain, he had full strength throughout the upper and lower, and proximal and distal extremities, muscle bulk and tone were normal, full hip abduction and hip extension strength, poor range of motion with hip abduction, and diminished reflexes throughout. *Id*. at 1-2.

Mr. Wilson states that as of June 2021, his right foot is still numb and has sharp pains at times, and his hands are sensitive. Br., Ex. A at ¶ 26. He has had muscle soreness and joint pain since the onset of GBS and his wife has to put on his shoes and

socks and trim his nails. *Id.* at 27. Mr. Wilson also states that he has cognitive deficits (penmanship, trouble conversing, finishing his sentences), and anxiety. *Id.* at ¶¶ 28, 30. He reports that the thing that bothers him the most is his left shoulder, as his ability to fish has been greatly diminished. *Id.* at ¶ 31. Finally, Mr. Wilson states that his ability to spend time with his family has been negatively impacted as his current physical and cognitive limitations make this time less joyful than it once was. *Id.* at ¶ 32.

### III.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, petitioners may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). A petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in a specific case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may also rely on my own

4

experience adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

### IV.    Appropriate Compensation in this Matter

#### A. Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

With respect to the severity and duration of the injury, Petitioner's medical records and his affidavit provide a description of the pain he experienced throughout the course of treatment, which he describes as a "particularly severe case of [GBS]." Br. at 1, 10. Specifically, Petitioner notes his two-week ICU stay, five-week rehabilitation hospital stay, he was in a wheelchair for three months following inpatient rehabilitation, his treatment required a lumbar puncture, an EMG, five sessions of PLEX, catheters, feeding tubes, a cardiac arrest, needing to be intubated, pain medication, sedatives, ST, PT, OT, and months of paralysis. *Id.* at 10-11.

Petitioner compares his course of treatment with those of the petitioners in *Devlin, Dillenbeck, Fedewa,* and *Johnson* to support a $225,000.00 pain and suffering award.[5] Br. at 13. Petitioner avers that his past and continuing experience with GBS has been worse in virtually every way compared to the experiences of those otherwise-comparable petitioners. *Id.* at 14. In particular, Mr. Wilson notes that he was in the hospital or inpatient rehabilitation for 50 days, and none of the aforementioned petitioners were ever placed on a feeding tube, were intubated, catheterized for two to three times per day for over a

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] Petitioner cites to *Devlin v. Sec'y of HHS*, No. 19-0191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr August 7, 2020) (awarding $180,000 for pain and suffering); *Dillenbeck v. Sec'y of HHS*, 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) (awarding $180,857.15 for pain and suffering); *Fedewa v. Sec'y of HHS*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. March 26, 2020) (awarding $180,000 for pain and suffering); *Johnson v. Sec'y of HHS*, No. 16-135V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000.00 for pain and suffering).

5

month, or had near-death experiences that required CPR. *Id.* Petitioner also contends that he has had lengthy and ongoing residual symptoms which include diminished cognitive functions, strength, and reflexes, and that he continues to be unable to do what he is most passionate about, which is fly fishing for tarpon. *Id.*

Respondent, on the other hand, argues that Petitioner's clinical course is less severe than seen in those in previous flu/GBS cases where damages were decided by the Court. Opp. at 7. Citing to the aforementioned cases, Respondent distinguishes Petitioner's course, noting that other petitioners required five to six months of live-in care, lost employment, or experienced sequelae more than two to three years after vaccination. *Id.* at 8. Petitioner, by contrast, only received one round of PLEX, and although he was intubated, he was extubated successfully. In addition, it was never definitively determined by Petitioner's healthcare providers that his cardiac events were related to his GBS, and his condition greatly improved during his inpatient PT and OT. *Id.* at 8-9. Respondent further notes that by March 2020, Petitioner had dramatic improvement, nearly regaining full strength, and by August 2020 he had demonstrably regained full strength and motor function. *Id.* at 9. In addition, despite claiming ongoing symptoms, Petitioner has not returned for additional medical follow-up or care related to his GBS since August 2020, less than a year after the onset of his symptoms. *Id.* at 9. Accordingly, Respondent considers a lower sum - $130,250.00 - to be an appropriate pain and suffering award. *Id.* at 10.

Respondent has given reasons to not give the highest award sought by Petitioner, but has not fully defended or justified his preferred figure. Respondent's position also minimizes to some extent the gravity and acute severity of Petitioner's course with GBS. On the other hand, Petitioner's demand is much higher than his cited case comparables. While Petitioner has faced a truly acute situation, similarly-situated claimants have not received pain and suffering awards greater than $200,000, absent exceptional circumstances. Petitioner may be correct in arguing that the award to be granted should be higher than Respondent proposes, but the number he offers is itself too high (although somewhat closer to what is likely the "right" sum under the circumstances).

In the cases cited by Petitioner, awards for actual pain and suffering ranged from approximately $170,000.00 to $180,000.00. Very significant to Petitioner's award in this case is the acute nature, presentation, and the invasive treatment he required to treat his GBS. Mr. Wilson was hospitalized and in the NICU for two weeks. During this time, he experienced tetraparesis, he received five sessions of PLEX therapy, his deteriorated respiratory condition required him to be intubated for a week, he had asystolic arrest, which despite Respondent's assertion, was stated to be driven and related to Mr. Wilson's AIDP, and he was on a feeding tube. Mr. Wilson then had a nearly five-week inpatient

SNF stay where he developed shingles and a bed sore. Additionally, Mr. Wilson attended 62 PT sessions and 32 OT sessions.

Even considering the initial acute presentation of Mr. Wilson's GBS, however, as well as his treatment history, his *overall* course was fairly reasonable for GBS cases. For example, one distinguishing factor is how the petitioner's injury effects their employment. In *Dillenbeck*, the petitioner's pain and suffering award reflected in part the personal cost of having to suffer with GBS initially and her recovery in the months following, as well as the role it may have played in negatively impacting her ongoing employment. *Dillenbeck* 2019 WL 4072069, at *14. There is, however, a qualitative distinction between someone who is retired and experiences GBS versus someone who is employed and experiences those same challenges to an extent that their employment is negatively impacted. And while a lost wages claim will provide direct compensation, the more intangible effects of a vaccine injury preventing a person from working as before *does* bear on pain and suffering as well.

Taking the above into account, it is clear that Mr. Wilson's injury mainly impacted his enjoyment of a variety of leisure pursuits. I note that personal leisure pursuits are indeed significant and relevant, but they are qualitatively different. And the evidence of some lingering sequelae must also be balanced against the fact that Petitioner's recovery in the most important areas of function and mobility has been good. I therefore find that **$175,000.00** in compensation for past pain and suffering is reasonable and appropriate in this case.

### B. Past Unreimbursed Expenses

The parties agree on the amount of $1,123.85 for past unreimbursed expenses. Opp. at 10. That sum is adopted in this damages decision.

### V. CONCLUSION

In light of all of the above, I award **Petitioner a lump sum payment of $176,123.85,** (representing $175,000.00 for Petitioner's actual pain and suffering and $1,123.85 for past unreimbursed medical expenses) **in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id.*

The clerk of the court is directed to enter judgment in accordance with this decision.[6]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.